# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

A.R.M, a minor,
by her legal guardian,
Duane A. Morlock,                                    **Civil No. 12-cv-322 (DWF/SER)**

       Plaintiff,

v.                                                   **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

---

     Gary A. Ficek, Esq., 15 Broadway Ste. 301, Fargo, ND 58102, on behalf of Plaintiff.

     David W. Fuller, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge.

     Pursuant to 42 U.S.C. § 405(g), Plaintiff A.R.M. ("Plaintiff") seeks review of the Commissioner of Social Security Michael J. Astrue's ("Commissioner") denial of Deanna I. Morlock's ("Morlock") application for Social Security Disability Insurance ("SSDI"). This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1. The parties filed cross-motions for summary judgment [Doc. Nos. 9 and 19]. For the reasons set forth below, the Court recommends A.R.M.'s motion for summary judgment be granted in part and denied in part, and the Commissioner's motion be denied.

     Deanna I. Morlock brought this action on February 17, 2012. A few months later, her attorney notified the court that Morlock died of her illnesses in June, 2012. A claim under 42

U.S.C. § 405(g) survives the death of the claimant. 42 U.S.C. § 404(d). Morlock is survived by one minor child, A.R.M., who succeeds her in interest. The Court granted claimant's Motion for Substitution of Party on August 7, 2012. (Mot. for Substitution of Party and Mem. of Law in Supp. of Mot.) [Doc. No. 12]; (Order dated Aug. 7, 2012) [Doc. No. 15].

## I.    BACKGROUND

### A.    Procedural History

The procedural history of this case is unusual and requires some elaboration. In most Social Security cases, the Court reviews a long, even lifetime history of illness or disability for a person who hopes to receive benefits in the future. Typically, the Court does not need to parse the exact category of benefits requested and instead concentrates on the procedure and substance of the Administrative Law Judge's (ALJ) decision.

This case, however, turns on the claimant's eligibility for SSDI benefits. There are two forms of Social Security benefits: SSDI ("Title II benefits") and SSI ("Title XVI benefits"). The purpose of the Title XVI program is to "assure a minimum level of income who are age 65 of over, or who are blind or disabled and do not have the sufficient income and resources to maintain a standard or living at the established Federal minimum income level." 20 C.F.R. § 416.110. In contrast, individuals earn Title II by "engaging in employment . . . or by engaging in a covered self-employment and paying a self-employment tax. Payment of these taxes is a payment of an insurance premium. Once the payment stops, coverage eventually ends." (Admin. R.). [Doc. No. 8 at 8].

Morlock was receiving some Social Security benefits when she filed the instant action. She applied for SSDI and SSI on April 13, 2007 ("First Application"). (*Id.* at 158). Her First

Application lists an alleged disability onset date (AOD) of March 27, 2007.[1]  (*Id*.).   The Commissioner immediately granted her Title XVI benefits for her diagnosis of Organic Mental Disorders (Listing 12.02).  (*Id*. at 88).

The Social Security Administration (SSA) denied Morlock's application for Title II benefits, however, because her date last insured (DLI) was December 31, 2005.  (*Id*. at 131-133). This denial did not stem from a finding of no disability, but rather from the procedural rules relating to eligibility.   Because her AOD was after her DLI of Dec. 31, 2005, Morlock was procedurally ineligible for Title II benefits.   42 U.S.C. §§ 416(i), 423(c).   In other words, Morlock's Title II "coverage" had run out on December 31, 2005.

After being denied Title II benefits, Morlock protectively filed a new Title II application for a period of disability and disability insurance benefits in September 2008 ("Second Application").[2]  (*Id*. at 135).  In her Second Application, she alleged a new onset date of April 1, 2000.  She claimed disability due to the following impairments: Raynaud syndrome,[3] brain

---

[1]      Plaintiff alleges she did not understand the importance of the DLI to Morlock's application for Title II benefits.  Morlock's ex-husband, Duane Morlock, furnished an affidavit stating that the SSA employees who interviewed them about her application did not allow them to review the information and did not explain the significance of the term "onset date."  (Aff. of Duane Morlock, Admin. R. at 264--65).

[2]      Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits.  The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to SSA on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27.  Program Operations Manual System (POMS), GN 00204.010C.5a-e. (SSA, June 23, 2011).   There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for Title II benefits must be documented and signed by a SSA employee.  POMS, GN 00204.010B.1 – GN 00204.010B.4. (SSA, June 23, 2011).

[3]      Raynaud syndrome is the sudden and recurrent discoloration of the fingers and toes caused by deficient oxygenation of the blood due to arterial and arteriolar contraction.  It is typically a result of cold or emotion.  *Stedman's Medical Dictionary*, Syndrome, Raynaud Syndrome, (27th Ed. 2000).

tumor, and scleroderma.[4] (*Id.* at 185, 189). The SSA acknowledged that medical records showed she also had borderline I.Q. and depression. (*Id.* at 99). These impairments allegedly prevented Morlock from obtaining gainful employment between April 1, 2000 and December 31, 2005, her DLI. (*Id.* at at 189). This time, to prevail in her case, evidence would have to show that Morlock's alleged impairments prevented her from working April 1, 2000 and December 31, 2005.[5]

Morlock's Second Application was denied on October 13, 2008, and again upon reconsideration on November 7, 2008. (*Id.* at 84-85). Morlock requested a hearing. Administrative Law Judge Hallie E. Larsen ("the ALJ") heard the matter on March 22, 2010. On May 7, 2010, the ALJ issued an unfavorable decision. (*Id.* at 5). The Appeals Council denied Claimant's request for a review of the ALJ's decision on December 14, 2011. (*Id.* at 1). The denial of further review rendered the ALJ's decision final. *See* 42 U.S.C. § 405(g); *Wilburn v. Astrue*, 626 F.3d 999, 1002 (8th Cir. 2010); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981. Morlock seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Because of the unusual procedural circumstances of this case, described *supra*, the Court confines itself to review of the ALJ's decision relating to Morlock's alleged disability between her AOD of April 1, 2000, and her DLI of December 31, 2005.

---

[4]     Scleroderma is the thickening and induration of the skin caused by new collagen formation, with atrophy of the hair follicles and sebaceous glands. *Stedman's Medical Dictionary*, Scleroderma, (27th Ed. 2000).

[5]     Evidence of an impairment which came into existence or reached disabling severity after the expiration of claimant's insured status cannot be the basis for a finding of disability. SSR 74-8c, 20 C.F.R. 404.115 (Dec. 15, 1972) *citing Henry v. Gardner*, 381 F.2d 191 (6th Cir. 1967); *Seals v. Gardner*, 356 F.2d 508 (5th Cir. 1966).

**B.      Claimant's Testimony**

On the date of the hearing, Morlock was a married forty-one-year-old woman with a high school education and one school-aged child.[6]  (Admin. R. at 39).  Her prior work experience consisted of a series of low-skill jobs, including working in a laundry.  Her last place of employment was the Dakota Clinic in Fargo, North Dakota, where she worked as a file clerk in the medical records department.  (*Id*. at 40).  Morlock testified that her job ended in 2000, when she and her family moved to Fergus Falls, Minnesota.  (*Id*.).  She stated that immediately following her move, she could have continued to work in the same kind of job, but she was unable to find similar work.  (*Id*.).  Morlock tried to find other employment, including fast-food jobs, but nothing was available.  (*Id*. at 40-41).  Eventually, she decided to become a stay-at-home mother.  (*Id*.).  While caring for her own daughter, she also provided daycare to one other child, but could not take on more children because she did not have the necessary license.  (*Id*. at 41-42).

Morlock testified that between 2000 and 2005 she experienced trouble walking, suffered from lung problems, and had ulcers on her hands and feet.  (*Id*. at 43).  She started using a cane in 2005, although not because a doctor prescribed one for her.  (*Id*. at 43-44).  Morlock felt she could walk about two blocks, and that she had pain in her hands and feet that prevented her from writing or carrying objects.  (*Id*. at 45–46).  She also testified about short-term memory problems that impacted her work performance.  (*Id*. at 49).  Asked for an example, she stated, "They would tell me to go to . . . a certain floor and I'd have to ask them again and to write it down.  If I wrote things down I could remember them."  (*Id*.).  She could not recall, however, receiving reprimands for her memory problems.  (*Id*.).  In addition to her memory problems, Morlock also

---

[6]      At the time of her death, Morlock was divorced and single.  (Mot. for Substitution of Party and Mem. of Law in Supp. of Mot.) [Doc. No. 12].

testified that she had problems with depression, for which she took prescription medication continuously between 2000 and 2005.[7]  (*Id.*).

From 2000 to 2005, Morlock cared for her daughter, and performed a number of household tasks including cleaning, laundry, and washing dishes.  (*Id.* at 45).  She had some hobbies, including crocheting small items for her home.  (*Id.* at 46).  Morlock used a computer without difficulty for about ninety minutes a day and volunteered at her church.  (*Id.*).

Morlock testified that she was able to care for her personal needs, including feeding, dressing, and bathing between 2000 and 2005.  (*Id.* at 47).  She was also able to care for her daughter and attended some of her daughter's kindergarten activities, as long as they did not involve a lot of walking.  (*Id.*).

On examination by her attorney, Morlock testified in more detail about her scleroderma diagnosis.  Morlock's hand and feet were "turning colors" in the cold.  (*Id.* at 51). Her primary care doctor, Dr. Peggy Sheldon, confirmed the diagnosis of scleroderma.  (*Id.*).  Morlock's feet and hands ached, and walking proved difficult.  (*Id.* at 53).  She also found it difficult to do "physical activities" because she could not breathe, a problem she attributed to the sclerosis of her lungs.  (*Id.* at 53-54).  Morlock explained that once he had scleroderma, tasks like lifting heavy groceries became impossible because she was so weak.  (*Id.* at 55).  If she bought groceries, she had to "leave [the bags] in the car until [her husband] came home and he would bring it [*sic*] in."  (*Id.* at 56).  She felt she could not have worked in a job that required lifting or standing all day.  (*Id.* at 57-58).  Morlock testified that double vision was not a problem for her at Dakota Clinic, because she did not have to read as a part of that job, but while using the

---

[7]     The Administrative Record contains no evidence that Morlock received psychotherapy or other treatment for her depression apart from the prescriptions she took.

computer at home, she had to "work through" discomfort caused by double vision.  (*Id*. at 59-60).

### C.     Medical Evidence

#### 1.     Morlock's Medical History Prior to 2000

The medical documents in the Administrative Record date back to 2000, but Morlock's history of serious medical problems began in her childhood.  The Administrative Record contains references to learning disabilities as early as kindergarten, when Morlock's school psychologist recommended she repeat a year of school.  (*Id*. at 439).  In 1985, while in high school, Morlock suffered from a loss of consciousness.  (*Id.*).  Medical tests revealed an arteriovenous malformation (AVM),[8] which resulted in emergency surgery and the placement of a shunt to divert the build-up of fluid around her brain.[9]  Soon after that procedure, Morlock had to switch from being right-handed to left-handed because of a loss of coordination in her right side.  (*Id*. at 532).  She also had double vision, and underwent surgical correction of a disconjugate gaze.[10]  (*Id*. at 383).  She reported learning difficulties following all these procedures, and missed half a year of high school following her surgery, although she did graduate.  (*Id*. at 806).

---

[8]     In the context of Morlock's health, an AVM is an abnormal connection between the arteries and veins in the brain.  Symptoms include headaches and vision problems.  An AVM can rupture and cause bleeding in the brain. Mayo Clinic Staff, *Brain AVM (arteriovenous malformation)*, Mayo Clinic (Feb. 11, 2011) http://www.mayoclinic.com/health/brain-avm/DS01126/DSECTION=symptoms.

[9]     A shunt is a prosthetic device that creates a bypass or diversion of fluid from one part of the body to another.  An arteriovenous shunt diverts blood directing from the arteries to the veins, without going through the capillary network.  *Stedman's Medical Dictionary*, Shunt, Arteriovenous shunt, (27th Ed. 2000).

[10]     A disconjugate gaze means that the eyes are not paired in action or joined together. *Stedman's Medical Dictionary*, Disconjugate, (27th Ed. 2000).

## 2. Medical Records Between 2000-2005

The medical records for the relevant time period are sparse. They begin in 2001, when Morlock visited a neurologist for a regular check of her shunt. (*Id*. at 872-73). In 2001 and 2003 her shunt was functioning properly and she had few side effects of her AVM other than a mildly ataxic gait.[11] (*Id*.).

While Morlock complained of swelling and pain in her hands as early as 2003, she did not receive her scleroderma diagnosis until February 2005. (*Id.* at 863, 882). After confirming the diagnosis, Dr. Sheldon referred Morlock to Dr. Patrick Stoy, a pulmonologist, because scleroderma also affects other organ systems, including the lungs. After a number of tests, Dr. Stoy diagnosed her with "diffuse interstitial lung disease, consistent with progressive systemic sclerosis." (*Id.* at 890). In September 2005, Dr. Stoy updated Morlock's diagnosis to "moderate restrictive lung disease," and Dr. Sheldon noticed "slight changes in the appearance of her face" and ulcers on her fingers. (*Id*. at 880, 882). By December 2005, Morlock's breathing had "stabilized" but her digital ulcers had recurred. (*Id*. at 267). She lost the tip of a finger on her left hand, and her Raynaud's syndrome prescription did not ease her symptoms. (*Id*.).

Dr. Thomas Osborn, another treating physician, felt that Morlock's prognosis was "a little bit of a mixed picture." (*Id*. at 269). On the positive side, he noted that she had gained twenty pounds. (*Id.* at 267). Negative indicators included "numbness and tingling in her fingers and toes," ulcers on her left foot, and occasional headaches. (*Id.*). Dr. Osborn also observed that the bones in Morlock's fingertips were disintegrating, as were the bones in her left foot. (*Id.*).

---

[11] Ataxia is an inability to coordinate muscle activity during voluntary movement, most often due to a brain or spinal cord disorder. *Stedman's Medical Dictionary*, Ataxia, (27th Ed. 2000).

Although this Report and Recommendation addresses only Morlock's condition from 2000-2005, it is worth noting that the Administrative Record contains voluminous documentation of her condition from 2005-2009. In 2006 she began a course of chemotherapy to combat her scleroderma. (*Id*. at 293-97). In February 2007, her medical records reveal she had a "guarded prognosis given the extensive skin involvement" of her scleroderma. (*Id.* at 275, 277).

Then, in late March 2007, Morlock began to suffer headaches, nausea, and vomiting and went to an emergency room at Lake Region Hospital in Fergus Falls, Minnesota, where she underwent two surgical corrections of her shunt. (*Id.* at 280, 364-65, 399-400, 410-12). By November 2008, she had "severe restrictive lung disease," as well a jenunal intussception, which is the collapse and blockage of the lower intestine.[12] (*Id*. at 507, 635). In March 2009, Morlock developed gangrene on her fingers and doctors noted a "gradual cognitive decline." (*Id*. at 542, 559). She also had trouble walking, and suffered chills and sweats at night. (*Id.* at 587). In the first part of 2009, Morlock unintentionally lost about seventy pounds, despite having a good appetite. (*Id*. at 626). In May 2009, she had several fingers and toes amputated. (*Id*. at 926). A few months later, Morlock experienced pneumonia and several episodes of supraventricular tachycardia, or rapid heart rate, and was placed on a ventilator for about a week. (*Id*. at 1030). At the end of 2009, Morlock was incapable of living alone or holding a pencil, and had difficulty speaking. (*Id*. at 1063-64).

### 3.        Morlock's Treating Physicians' Opinions

Dr. Sheldon furnished a letter to Morlock's attorney on September 22, 2009, describing her observation of Morlock's illnesses. (*Id*. at 954). Dr. Sheldon's opinion concentrated mainly on medical problems from outside the time period at issue. (*Id*.). Dr. Sheldon stated that

---

[12]     Mayo Clinic Staff, *Intussusception*, Mayo Clinic (Dec. 14, 2012) http://www.mayoclinic.com/health/intussusception/DS00798

Morlock was diagnosed with scleroderma in 2005, and there is "no specific cure" for her disease. Dr. Sheldon described Morlock's interstitial lung disease as causing "shortness of breath and recurrent pulmonary infections and pneumonia." (*Id.*). Finally, Dr. Sheldon stated that Morlock had "significant problems with Raynaud phenomenon to her extremities." (*Id.*). Dr. Sheldon concluded that Morlock "is without a doubt completely disabled from any gainful employment." (*Id.* at 955).

Dr. Sheldon supplemented her opinion with a second letter, dated February 16, 2010. In that letter, she stated:

> A question has arisen as to the date she became disabled. Reviewing the medical records and understanding the course of her disease, I believe that I would state that [Morlock] was disabled and unable to be employed when first evaluated by myself on February 17, 2005. She had already suffered from the large cerebellar AV malformation that led to ataxia. In February 2005 we established the diagnosis of scleroderma, a serious progressive illness. She already manifested the cardinal symptoms including thickening of the skin, nonhealing digital ulcers, Raynaud phenomena, problems with swallowing, and esophageal motility, and most significantly, a diffuse interstitial lung disease.

(*Id.* at 956).

Dr. Stoy also submitted a medical opinion, but it also focused on medical evidence from outside the relevant period. He stated Morlcok had "a restrictive lung disease process from the scleroderma" and concluded that she "would be considered disabled by a pulmonary standpoint." (*Id.* at 510).

### 4.      State Agency Medical Consultants' Opinions

The record contains numerous State Agency Medical Consultants' opinions. When Morlock filed her First Application, Dr. Charles T. Grant reviewed her medical records and provided an assessment. Dr. Grant noted that Morlock was limited to occasional fingering. (*Id.* at 1219). Apart from that, her physical limitations include occasionally lifting no more than 20 pounds, frequently lifting no more than 10 pounds, standing or working about 6 hours in a

normal workday, sitting for about 8 hours in a normal workday, and limitations in her upper extremities. (*Id.* at 1217).

As a part of Morlock's First Application, she participated in a consultative examination with Dr. Dale Campbell, a state disability examiner. At that examination, Morlock, her husband, and her mother recounted Morlock's memory problems, concentration problems, and learning disability. (*Id.* at 438). The examiner noted that Morlock "had seen a psychologist in kindergarten who recommended that she be [held back in school] but the teacher said to not retain her, and she was passed on." (*Id.* at 439). Dr. Campbell then administered some tests to Morlock, including the Wechsler Memory Scale – Third Edition (WMS-III) and the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III). (*Id.* at 441-43). He described her behavior during the test as "childlike" and "a bit exuberant" during some portions of the test. (*Id.* at 441-42). Campbell also observed her laughing often and "sometimes [he] did not know at what she was laughing, although it seemed to be a question of mine or a part of the test." (*Id.*) Morlock's verbal I.Q. score was 70; her performance I.Q. was 86, and her full scale I.Q. score was 76. (*Id.* at 446).

Dr. Russell J. Ludeke provided a Psychiatric Review for Morlock's First Application. Ludeke noted that although Morlock could do some activities of daily living like use a computer, play Monopoly with her daughter, watch TV, cook, and do household chores, she met Listing 12.02, Organic Mental Disorders. (*Id.* at 1199). He found that she had a memory impairment, change in personality, and a disturbance in mood. (*Id.* at 1200). He diagnosed her with amnestic disorder and personality change due to brain surgery. (*Id.*). Dr. Ludeke also found that there was another medically determinable impairment that does not precisely satisfy the diagnostic criteria for Listing 12.02, describing it as "I.Q. decline very likely." (*Id.*). Dr. Ludeke found that

Morlock had marked limitations in activities of daily living and maintaining concentration, persistence, or pace, and moderate difficulties in social functioning, but did not find any episodes of decompensation. (*Id.* at 1209). Dr. Ludeke's notes stated that a learning disability was "identified by kindergarten" and that Morlock's diagnosis "might actually have been extended to the level of dementia" with "significant cognitive deficits apparent" from the WAIS - III testing. (*Id*. at 1211).

For Morlock's Second Application, state disability examiners were requested to complete a review of medical evidence from her AOD through the DLI only. (*Id.* at 457). Dr. Ludeke again reviewed Morlock's file, and concluded that an RFC assessment was necessary. (*Id.* at 458). He assessed that Morlock had psychological or behavioral abnormalities associated with dysfunction of the brain, but unlike his 2007 assessment did not find a memory impairment, change in personality, or disturbance in mood. (*Id.* at 459). However, he did note a "likely borderline IQ w/learning difficulties" in his assessment. (*Id.* at 459). In terms of limitations, Dr. Ludeke found that Morlock had mild limitations in activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 468). He did not find episodes of decompensation. (*Id.*) In his notes, he describes a history of learning difficulties. (*Id*. at 470). Dr. Ludeke stated further:

> From AOD to DLI [Morlock] probably had a severe mental impairment, 12.02, with lowered I.Q. and memory scores, although those scores may have been lowered by the 2007 blockage in her shunt. Further, her depression may have worsened recently. It is likely, given her history of learning difficulties and her brain surgery at 15, that her condition was severe prior to DLI but not inconsistent [with short repetitive tasks] and brief and superficial contact.

(*Id.* at 470).

Dr. Sandra Eames completed the physical residual functional capacity (RFC) assessment for Morlock's Second Application on November 8, 2008. (*Id*. at 486). Dr. Eames characterized

the assessment as a "current evaluation." (*Id.* at 478). Dr. Eames assessed Morlock's physical limitations as identical to those in her First Application, include occasionally lifting no more than 20 pounds, frequently lifting no more than 10 pounds, standing or working about 6 hours in a normal workday, sitting for about 8 hours in a normal workday, and limitations in her upper extremities. (*Id.* at 480). Notably, the Disability Determination Services requested Morlock's medical records "From 01/01/06 to Present" according to the request forms included in the Administrative Record, despite the fact that this disability determination was explicitly for the period 2000-2005. (*Id.* at 271, 285). Morlock's counsel supplied medical records from the period 2000-2005 to the SSA on February 2, 2010. (Aff. of Gary A. Ficek, "Ficek Aff.") [Doc. No. 23 at 1].

### D. Evidence from the Vocational Expert

Warren Haagenson testified as a vocational expert ("VE") at the hearing before the ALJ. (*Id.* at 70-81). Haagenson has a M.S. in Counseling and Guidance from North Dakota State University. (*Id.* at 126). He is a certified disability management specialist. (*Id.*).

The ALJ asked Haagenson to consider a hypothetical younger person with the same work experience as Morlock and had the residual functional capacity to lift up to ten pounds frequently and twenty pounds occasionally; to sit and stand or walk about six hours in an eight-hour day with normal breaks. (*Id.* at 71-72). The individual can occasionally climb stairs or ramps, balance, stoop, kneel, crouch and crawl, but should never climb ladders, ropes or scaffolds. (*Id.*). The individual is limited to occasionally fingering bilaterally and must avoid even moderate exposure to extreme cold or work around hazards such as dangerous moving machinery or unprotected heights. (*Id.*).

Haagenson testified that such a person could not perform Morlock's past work, because each job required frequent fingering. (*Id*. at 72). Haagenson stated that there are jobs that a hypothetical person with those restrictions could perform, including usher (DOT 344.667-014), ticket-taker (DOT 344.667-010), or arcade attendant (DOT 342.267-014).

Next, the ALJ asked Haagenson to consider a hypothetical younger person with the same work experience as Morlock who had the residual functional capacity to lift up to ten pounds frequently and twenty pounds occasionally; who can sit about six hours and stand/walk at least two hours in an eight-hour day with normal breaks. (*Id.* at 73). The individual should never climb ladders, ropes, or scaffolds and only occasionally climb stairs, ramps, balance, stoop, kneel, crouch or crawl. (*Id.*). The individual should avoid even moderate exposure to extreme cold or work around hazards. The individual is limited to understanding, remembering, and carrying out short, simple instructions. (*Id.*).

Haagenson opined that such a person could not do Morlock's past work, because each of the claimant's previous jobs would require more than two hours of standing and walking. (*Id.*). According to Haagenson, however, there are some sedentary jobs, including eyeglass frame assembler (DOT 713.687-018) and sport equipment/toy stuffer (DOT 731.685-014), that such a person could perform. (*Id.*at 75).

In her third hypothetical, the ALJ asked Haagenson to consider a hypothetical younger person with the same work experience as Morlock who had the residual functional capacity to lift up to ten pounds frequently and twenty pounds occasionally; who had the ability to sit or stand or walk up to six hours each in an eight-hour day but needs an opportunity to alternate positions after thirty minutes and remain in the next fixed position for up to thirty minutes. (*Id.*at 75). The individual should never climb ladders, ropes, or scaffolds and only occasionally climb

stairs or ramps, balance, stoop, kneel, crouch or crawl. (*Id.*). The individual should avoid even moderate exposure to extreme cold and work around hazards; is limited to understanding, remembering, and carrying out short, simple instructions. (*Id.*).

Haagenson opined that such a person could not perform Morlock's previous work, but that there are other jobs in the national economy that would accommodate the hypothetical limitations the ALJ described. (*Id.* at 75-76). He asserted the sedentary jobs he identified, including toy stuffer, would be among the job listings suited to the limitations in the third hypothetical. (*Id.* at 76).

In her fourth and final hypothetical, the ALJ asked Haagenson to consider a person identical to the person described in her third hypothetical, but who was limited to only occasional bilateral fingering. (*Id.* at 76). Haagenson could identify only one occupation that would fit those limitations, fishing reel assembler (DOT 732.684-062), but he did not know how many fishing reel assembly jobs are available in the national or regional economy. (*Id.* at 76-77).

Morlock's attorney then asked Haagenson about the number of fishing reel assembly jobs available in Minnesota and Wisconsin. (*Id.* at 78). Haagenson responded that he had no realistic idea of how many jobs are regionally available in that job code listing. (*Id.*).

Morlock's attorney then questioned Haagenson about whether a lack of visual acuity would affect his opinions about the jobs available for the third hypothetical. (*Id.* at 78-79). Haagenson stated that an individual with a lack of visual acuity would have trouble performing such jobs. (*Id.*). Morlock's attorney also asked Haagenson how fibrosis of the lungs, which Morlock stated made her "tired throughout the day," would affect Morlock's ability to work. (*Id.* at 79.) Haagenson stated that since Morlock testified she needed to rest in a recliner for three hours per day, she would not be eligible for competitive employment. (*Id.*). Haagenson also

acknowledged that Morlock's memory and concentration problems would also preclude her from seeking competitive employment.  (*Id.*).

### E.        The ALJ's Decision

On October 13, 2009, the ALJ issued an unfavorable decision, finding that Morlock was not disabled between her alleged onset date of April 1, 2000 and December 31, 2005, her DLI. (*Id.* at 8-23).

The ALJ employed the required five-step evaluation, considering: (1) whether Morlock was engaged in substantial gainful activity; (2) whether Morlock had severe impairments; (3) whether Morlock's impairments met or equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Morlock was capable of returning to past work; and (5) whether Morlock could do other work existing in significant numbers in the regional or national economy.  *See* 20 C.F.R. § 416.920(a)–(f).

At the first step of the evaluation, the ALJ found Morlock had not engaged in substantial gainful activity between April 1, 2000 and her DLI of December 31, 2005.  (*Id.* at 11).  At the second step, the ALJ found Morlock had the following severe impairments: a history of arteriovenous malformation to the brain with peritoneal shunt (diagnosed in 1984), scleroderma (diagnosed in February of 2005), Raynaud syndrome, fibrosis of the lungs, affective disorder, and cognitive disorder.  (*Id.*)  (citing 20 C.F.R. §§ 404.1520(c)).

At step three, consistent with the opinions of the State Agency Medical Consultants, the ALJ determined Morlock did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525–1526, 416.920(d), 416.925–926).  (*Id.* at 12).  In making her determination, the ALJ considered the following Listings: Section 3.00 (Respiratory System),

Section 12.02 (Organic Mental Disorders), Section 12.04 (Affective Disorders), and Section 14.00 (Immune System). (*Id.*). The ALJ did not state specifically which sub-categories of Listings 3.00 and 14.00 she considered.

The ALJ decided that Morlock did not meet or medically equal Listings 12.02 or 12.04 because insufficient evidence to satisfy the "paragraph B" criteria for either listing existed. (*Id.* at 13). To satisfy paragraph B of those Listings 12.02 and 12.04, the mental impairments must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart P, Appendix 1 The ALJ found that Morlock had mild restriction in activities of daily living between 2000 and 2005. (*Id.* at 13). The ALJ also found that Morlock had mild difficulties in social functioning and moderate difficulties in concentration, persistence, or pace during that same period. (*Id.* at 13-14). The ALJ found no evidence of episodes of decompensation or hospitalization for mental health reasons. (*Id.* at 14).

The ALJ also considered whether Morlock met the "paragraph C" criteria of listings 12.02 or 12.04. She found that there was no evidence of "repeated episodes of decompensation, a residual disease process that even minimal increases in mental demands would cause the claimant to decompensate, or a history of an inability to function outside a highly supportive arrangement." (*Id.* at 14). The ALJ did not provide a similarly detailed explanation for her rejection of Listings 3.00 and 14.00, although her decision later recited portions of Morlock's medical history. (*Id.* at 17-18).

Next the ALJ determined that Morlock had a light RFC. (*Id.* at 14). The ALJ wrote a lengthy description of her findings and the reasons for them. She began by recounting Morlock's

First Application for Social Security benefits, and the problems that arose when the Morlock's alleged onset date was later than her DLI. (*Id*. at 15). Next, the ALJ summarized Morlock's subjective complaints, listing them as "limited use of hands and feet causing difficulty walking, standing and climbing stairs," and a requirement for "rest up to three hours per day prior to December 2005" as well as "chronic fatigue and memory problems prior to December 2005." (*Id*. at 15-16).

The ALJ then summarized third-party evidence, including a Function Report-Adult Morlock's then-husband completed. (*Id*. at 16). That report described Morlock's health in March 2007, Mr. Morlock reported that his wife could go on long walks, drive a vehicle, and ride a bike. (*Id.*). Morlock observed, however, that his wife had difficulty with cleaning, cooking, and climbing stairs and experienced a deteriorating short-term memory. (*Id.*). The ALJ also summarized letters from Morlock's friends and relatives, but decided they "offer[ed] very little in the way of support for claimant's allegation of disability prior to December 31, 2005" because the letters mainly described her health after that period. (*Id*, at 17).

The ALJ then found that Morlock's medically determined impairments could have caused symptoms she described prior to December 2005, but that Morlock's statements about the intensity, persistence and limiting effects were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.* at 17). She elaborated on her finding, stating that while Morlock "probably had severe mental impairments prior to December 31, 3005 . . . there is no evidence that such impairments prevented the claimant from performing work involving short, simple instructions/tasks." (*Id.*). The ALJ also noted that Morlock "had significant gait and memory problems following her brain surgery in 1984.

However, due to [her] perseverance and hard work she was able to successfully complete high school and be gainfully employed thereafter." (*Id.*).

The ALJ gave the greatest weight to the opinions and RFC reports offered by the medical consultants working for Disability Determination Services. (*Id.* at 20). The ALJ declined to give controlling weight to Morlock's treating physicians Dr. Sheldon and Dr. Stoy. (*Id.*). The ALJ rejected Dr. Sheldon's conclusions, finding that while she had "no doubt that claimant is currently disabled and has been since March 27, 2007, the date she originally alleged disability, the undersigned cannot assign significant weight to the opinion of Dr. Sheldon as it is totally inconsistent with the record as a whole." (*Id.*). Significantly, the ALJ found the objective medical evidence did not support Dr. Sheldon's and Dr. Stoy's assessments. (*Id.*). The ALJ summed up her assessment as follows:

> The undersigned can see that the claimant's condition worsened in 2005 (compared to 2000 to 2004) and it was the beginning of a progressive decline, but the evidence does not preclude all work through her date last insured of December 31, 2005. While the evidence reflects that the claimant was experiencing symptoms, the medical records do not support disability prior to December 31, 2005.

(*Id.* at 20-21).

Specifically, the ALJ found that jobs existed in the national economy that would offer sedentary or sit/stand options. (*Id.* at 21). In addition, she found that Morlock's gait and memory problems "did not deteriorate or interfere with her ability to attend school and work in the past and certainly did not do so prior to December 31, 2005." (*Id.*).

At step five, the ALJ determined Morlock was unable to perform past work as a laundry worker, daycare provider, or medical records clerk, because the exertional demands of those occupations exceeded her RFC. (*Id.* at 22). Nevertheless, the ALJ concluded there were other jobs existing in the national economy that Morlock was able to perform. (*Id.*). This

determination was based on the VE's testimony. (*Id.* at 23). Accordingly, the ALJ concluded that Morlock was not disabled between her alleged onset date, April 1, 2000 and December 31, 2005, her DLI, as defined in 20 C.F.R. § 404.1520(g). (*Id.* at 23).

## II.     STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.*

### A.     Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. 20 C.F.R. §§ 404.967–.982, 416.1467. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty

days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

### B. Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

In addition to these familiar factors, the Court specifically looks at the ALJ's findings about the onset of Morlock's disability because of the unique procedural nature of this case. Evidence of an impairment which came into existence or reached disabling severity after the expiration of plaintiff's insured status cannot be the basis for a finding of disability. *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992); *see also Henry* v. *Gardner*, 381 F.2d 191 (6th Cir. 1967), *Seals* v. *Gardner*, 356 F.2d 508 (5th Cir. 1966).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have

supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.  DISCUSSION

Plaintiff raises three issues on appeal.  First, she argues the ALJ's decision not to assign significant weight to Morlock's treating physicians' opinions was reversible.  Second, she argues that the ALJ's findings of fact regarding the onset of disability are not supported by substantial evidence on the record as a whole.  Lastly, Plaintiff argues that the ALJ failed to fully develop the record as to whether Morlock met the Listing criteria for scleroderma (Listing 14.04) or mental retardation (Listing 15.05). (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. "Pl.'s Mem.") [Doc. No. 10].  The Court considers each argument in turn.

### A.  The Decision Not to Assign Controlling Weight to Treating Physicians

The ALJ did not assign controlling weight to Dr. Sheldon and Dr. Stoy's opinions, finding that Dr. Sheldon's opinion was inconsistent with her treatment notes, and Dr. Stoy's opinion discussed Morlock's health only for the period after 2005.  Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding.  20 C.F.R. § 404.1527(c)(2).  In fact, when supported by proper medical testing, and not inconsistent with other substantial evidence on record, the ALJ must give such opinion controlling weight. (*Id.*)  "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citation and internal quotation omitted).

With respect to Morlock's physical illnesses, however, it is not clear that the ALJ had access to "better or more thorough" medical information.  First, Dr. Eames's November 2008

Physical RFC Assessment bears several indicators of unreliability. Despite the fact that this case turns on Morlock's health between 2000 and 2005, Dr. Eames lists her assessment as a current one, not a historical assessment. (Admin. R. at 478). Secondly, Dr. Eames used records "From 01/01/06 to Present" according to the request forms included in the Administrative Record. (*Id.* at 271, 285). In fact, the SSA only gained access to records from 2000-2005 when Morlock's counsel supplied them on February 2, 2010. Since this was over a year after Dr. Eames completed her assessment, the Court cannot conclude that records from the pertinent time period were available to Dr. Eames. (Ficek Aff. at 1). The Court does not question the ALJ's decision to reject Dr. Stoy and Dr. Sheldon's opinions, but an RFC assessment such as Dr. Eames's is an inadequate alternative.

Although Plaintiff does not raise this issue, the SSA's failure to obtain the proper records also impacts the ALJ's credibility determination. As noted above, the ALJ found that Morlock's statements about the intensity, persistence and limiting effects were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.* at 17). Without a proper physical RFC, the ALJ's credibility determination is also unreliable. Again, the Court does not substitute its judgment about Morlock's credibility for the ALJ's, but it also will not defer to Dr. Eames's inadequate physical RFC.

### B. The ALJ's Determination of Morlock's Onset Date.

Morlock next contends that the ALJ's findings of fact are not supported by substantial evidence on the record as a whole because "the ALJ's view of the evidence in this case was colored by [Morlock's] earlier application for benefits." (Pl.'s Mem. at 15). Some of Plaintiff's arguments on this issue are unavailing. This Court is troubled that the ALJ did not make clearer

findings with respect to Morlock's existing disability, Organic Mental Disorder (Listing 12.02), to determine whether it existed prior to the replacement of Morlock's shunt in late March 2007.

There is substantial evidence in the record that Morlock had mental and cognitive limitations prior to the AOD in her First Application. Indeed, the ALJ writes that Morlock "probably had severe mental impairments prior to December 31, 3005." (Admin. R. at 17). Yet the ALJ did not adequately explain why Morlock's Organic Mental Disorder did not meet listing level severity before March 27, 2007. Dr. Ludeke posed this very question in his assessment, when he wrote, "From AOD to DLI [Morlock] probably had a severe mental impairment, 12.02, with lowered I.Q. and memory scores, although those scores may have been lowered by the 2007 blockage in her shunt." (*Id.* at 470).

Given that Ms. Morlock is alleging brain tumor as one of her disabilities, a proper evaluation of that condition is necessary. Listing 12.02 defines an Organic Mental Disorder as requiring "a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." Clearly, an AVM is a "specific organic factor" that could cause an abnormal mental state or a loss of functional abilities.

In this case, there are two discrete, serious medical events involving Morlock's brain function: Morlock' 1984 AVM diagnosis and subsequent brain surgery, and her 2007 shunt replacement. Thus, the ALJ should have made a determination as to whether Ms. Morlock's AVM diagnosis in 1984 was the catalyst of her Organic Mental Disorder, or a specific finding that the shunt revision in 2007 caused her decline in I.Q. and other symptoms. The ALJ's decision sidesteps this issue and leaves the Court without adequate information about the impact of the two brain surgeries and their relation to Morlock's Organic Mental Disorder.

An ALJ must adequately explain his or her factual findings in order to permit the Court to determine whether substantial evidence supports the decision. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (citing *Chunn v. Barhardt*, 397 F.3d 667, 672 (8th Cir. 2005)); *Pettit v. Apfel*, 218 F.3d 901, 903–04 (8th Cir. 2000)). The Eighth Circuit consistently holds that "an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination." *Scott*, 529 F.3d at 822 (quoting *Senne v Apfel*, 198 F.3d 1065, 1067). If a court cannot make a determination about the adequacy of the findings, however, remand is appropriate.

## C. The ALJ's Failure to Develop the Record Relating to Mental Retardation and Scleroderma

Plaintiff's third argument is that the ALJ improperly determined that Morlock's scleroderma did not meet listing level severity by her DLI, and that the ALJ failed to consider Mental Retardation, Listing 12.05. Plaintiff's argument about Morlock's scleroderma is closely related to her argument about Dr. Eames' assessment. Since the ALJ relied on a physical RFC report that itself relied data from the wrong years, a proper review of the correct medical records should resolve the issue.

Plaintiff's argument about mental retardation is somewhat different. The administrative hearing is not an adversarial proceeding. *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). The ALJ is not required to investigate a claim not presented, but has a duty to fully develop record even in cases such as this where the Plaintiff is represented by counsel. *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008); *Delarosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991). In her Second Application, Morlock alleged Raynaud syndrome, brain tumor, and scleroderma. (Admin. R. at 99). The SSA also knew that Morlock had a borderline I.Q. (*Id.*). Yet despite the

SSA's awareness of Morlock's low I.Q., the ALJ considered only Listing 12.02 and 12.04 in her decision. The decision does not mention Listing 12.05, nor does it otherwise indicate that he considered the listing to be relevant to Morlock's disability claim. There is circumstantial medical evidence, however, that Morlock may have met that listing prior to the December 31, 2005, the DLI.

The introduction to the Listings for mental disorders provides that:

Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [the SSA] will find that your impairment meets the listing.

20 C.F.R. pt. 404, subpt. P. app. 1 § 12.00.

The introductory paragraph for Listing 12.05 also explains, "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P. app. 1 § 12.05. A claimant need not establish a formal diagnosis of mental retardation to meet the Listing, but the claimant must show "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhardt*, 438 F.3d 897, 899 (8th Cir. 2006).

In this case, Dr. Campbell's evaluation of Morlock reveals that she has a valid verbal IQ score of 70, satisfying the first requirement of paragraph C of Listing 12.05. (Admin. R. at 446). There is also circumstantial evidence that she had learning difficulties from a very young age, even from kindergarten. (*Id.* at 439). Given Morlock's significant history of physical ailments,

including ataxic gait, double vision, and other complications from her AVM, scleroderma, and Raynaud syndrome the necessary "additional and significant" limitation required by *Maresh* may also have been present. The ALJ's failure to consider Listing 12.05 creates a significant gap in the Court's understanding of this case, hindering a full and proper judicial review.

This Court has reviewed the record carefully and cannot conclude that substantial evidence on the record as a whole supports the ALJ's decision at step three. *Hensley*, 352 F.3d at 355. The ALJ wrote in great detail about her findings, but unfortunately missed several key issues, including the adequacy of Dr. Eames's assessment, a specific finding on Morlock's Organic Mental Disorder, and whether Morlock meets Listing 12.05, Mental Retardation. In doing so, the ALJ failed to support adequately her finding at step three that Morlock's impairments did not equal a listed impairment. *Scott*, 529 F.3d at 822 (citing *Chunn*, 397 F.3d at 672); *Pettit*, 218 F.3d at 903–04. For these reasons, the Court recommends that the case be remanded to the ALJ for further action consistent with this Report and Recommendation.

IV.    **RECOMMENDATION**

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff A.R.M.'s Motion for Summary Judgment [Doc. No. 9] be **GRANTED as to remand**;

2. Plaintiff A.R.M.'s Motion for Summary Judgment [Doc. No. 9] be **DENIED to the extent Plaintiff seeks reversal and outright award of benefits**;

3. Defendant Commissioner's Motion for Summary Judgment [Doc. No. 19] be **DENIED**;

4. This case be **REMANDED** to the Commissioner for further proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g).

Dated: January 10, 2013


*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 24, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.